## Phidias Dantos, d/b/a Hotel Coolidge v.
## New England Telephone & Telegraph Company

[449 A.2d 953]

No. 171-81

Present: Barney, C.J., Billings, Hill, Underwood and Peck, JJ.

Opinion Filed July 7, 1982

*John W. Brockway,* White River Junction, for Plaintiff-Appellant.

*Christopher M. Bennett* and *Gregory J. Condon,* Boston, Massachusetts, for Defendant-Appellee.

**Hill, J.** This is an appeal from a decision of the Public Service Board overruling the conclusion of a hearing examiner in favor of the petitioner, Dantos. We reverse.

The facts as found by the hearing examiner were accepted by the Board and are not challenged by the parties. They disclose that Dantos first became owner of the Hotel Coolidge at White River Junction in 1970. His title came through a corporation called Northern Real Estate Corporation. In 1973 he sold the hotel to the Southern Realty Corporation. Mr. Dantos became a junior mortgagee. Southern Realty Corporation experienced financial difficulties during late 1979 and early 1980. With the encouragement of senior mortgagees, Mr. Dantos reopened the hotel on January 25, 1980, under the ownership of Northern Real Estate Corporation.

At that time the telephone facilities at the Hotel Coolidge consisted of a switchboard with three public lines (numbers 295-3118, 295-3119 and 295-2110) and a private line (number 295-8113). All forms of advertising for the Hotel Coolidge, including the telephone directory, listed the phone number 295-3118.

Upon taking over the hotel on January 25, Dantos learned that the telephone service to the hotel either had been or was going to be terminated. He immediately called a representative of the telephone company in Burlington, Vermont. He guaranteed all future bills of the hotel and gave both his home and office phone numbers in Massachusetts as references. Later that afternoon, Mr. Dantos learned that all three public lines to the hotel had been disconnected.

It was not until Monday morning, January 28, 1980, that he was able to contact the company's business office in Burlington. The company advised him that the outstanding balance of the hotel account was $1574.86, which, minus a $300 deposit originally made by Southern Realty, amounted to a

debt of $1274.86 owed to the telephone company. He was further advised that service would be restored to the hotel with the original numbers upon receipt by the telephone company of a $1200 deposit and the payment of the $1274.86 past due balance. The company representative stated that if he did not pay the outstanding bill he could have service restored to the hotel upon receipt of the $1200 deposit, but that new numbers would be assigned to the hotel.

As the hearing examiner specifically found, it was decidedly to Dantos's advantage to retain the existing telephone numbers. Dantos therefore agreed to pay the outstanding balance of $1274.86 and the company agreed to restore the service at the three numbers on the switchboard. No deposit was required for future bills. On January 29, 1980, after an agent of Dantos paid $1274.86, the company reinstated service to the hotel's public numbers.

Dantos filed this petition to recover the amount paid on Southern Realty's account. The hearing examiner concluded that the telephone company acted improperly in requiring Mr. Dantos to pay the outstanding debt owed to the company by Southern Realty to retain the telephone numbers of the hotel. The Public Service Board adopted the hearing examiner's factual findings, but reached the opposite conclusion. The Board held that the company "validly disconnected service to a number for non-payment of a bill." The Board also noted that "[t]he parties reached an agreement whereby the Company would reconnect the number and the petitioner would pay the arrearage." Finally, the Board rejected the hearing examiner's contention that the company used the listed number as a lever to gain unfair advantage over the hotel in the company's efforts to get its bill paid: "[S]ince the Company limited its demand to payment of the outstanding arrearage, we fail to see any abuse, either legal or equitable."

From this decision Dantos appealed, and the Board certified the following question:

> Did the Public Service Board err in concluding that the New England Telephone and Telegraph Company acted properly with respect to the petitioner herein?

On appeal, the company claims that its regulation implementing the tariff defeats the appellant's claim. The regulation provides that a customer has no property right in a telephone number, and the company may change the number at any time for any reason. We disagree with the company's argument, and conclude that the Board's reasoning was erroneous. Thus, we reverse the Board's decision.

First, the Board's conclusion that there was an "agreement" between Mr. Dantos and the company is unsupported by its own findings. The appellant had no choice in this case: he either paid Southern Realty's bill, or gave up the benefits of the established business number. The findings demonstrate that both of these options were costly, and that the appellant chose the lesser of the two evils. Furthermore, we cannot imply, as the Board apparently did, a duty to pay under protest to protect the right to appeal the charge. Absent evidence of an explicit agreement to forego this claim, the appellant retained the statutory right to challenge the charges in legal proceedings. See 30 V.S.A. § 209.

The Board's conclusion that the company "validly disconnected service to a number for non-payment of a bill" is completely off point. The appellant has not challenged the disconnection. Rather, he challenges the payment exacted as a price for *reconnecting* the phone numbers. It is the validity of this demand which is at the heart of this case. We now turn to this issue.

This Court has previously held that a public utility may not refuse to provide service because of a dispute over a collateral bill. *Ashline* v. *Public Electric Light Co.*, 114 Vt. 301, 303, 44 A.2d 164, 165 (1945). Moreover, the legislature has mandated that public utilities must furnish services to individuals who "tender . . . the charges or rental sum usual or customary for the class of service required, *without discrimination for the same class of service rendered* . . . ." 30 V.S.A. § 2704 (emphasis supplied). The company's action in this case violated these principles. By requiring Dantos to pay Southern Realty's bill, the company blatantly discriminated against him on the basis of a collateral matter. The company was more than willing to allow Dantos to retain the same phone numbers—as long as he paid Southern Realty's bill. Such naked

coercion is prohibited by the plain mandate of our statute and case law.

Thus, the company's argument that its tariffs allow it to alter numbers at will is no more than a disingenuous attempt to distort its legal duty. A federal court dismissed this contention succinctly: "The tariff provision negatives any claim of a customer to a property right in a telephone number but cannot be construed to authorize the telephone company to exercise arbitrary dominion over the number so as to cause harm and injury to another." *Shehi* v. *Southwestern Bell Telephone Co.*, 382 F.2d 627, 630 (10th Cir. 1967); accord, *Price* v. *South Central Bell*, 294 Ala. 144, 149, 313 So. 2d 184, 188 (1975). 30 V.S.A. § 2704 prohibits the "arbitrary dominion" invoked by the company, and mandates reversal of the Board's order.

*The certified question is answered in the affirmative and the cause is remanded.*